UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 08-1172(DSD/JJG)

Kimberly G. McCoy,

      Plaintiff,

v.                                       **ORDER**

Qwest Corp. a Colorado
corporation,

      Defendant.

    Sonja D. Peterson, Esq. and Dunnwald & Peterson, P.A., 412 South Fourth Street, Suite 1150E, Minneapolis, MN 55415, counsel for plaintiff.

    Kristy L. Albrecht, Esq., Matthew Kipp, Esq., Benjamin J. Hasbrouck, Esq., and Dorsey & Whitney, P.O. Box 1344, 51 Broadway, Suite 402, Fargo, ND 58107, counsel for defendant.

This matter is before the court on the parties' cross-motions for summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants defendant Qwest Corporation's ("Qwest") motion.

**BACKGROUND**

This employment dispute arises out of Qwest's October 24, 2006, termination of plaintiff Kimberly McCoy ("McCoy"). McCoy began work at Qwest on October 28, 1989, as a customer service specialist. In that position, McCoy answered telephone inquiries from customers about Qwest's services. (McCoy Dep. at 16.)

McCoy was subject to Qwest's Code of Conduct and related policies, including Qwest's Occupational Employment Performance ("OEP") and Substance Abuse policies. (Id. at 144, Ex. 20.) Pursuant to the OEP policy, a customer service specialist achieved satisfactory performance by having no more than five absence occurrences or eight absence days in the preceding twelve months. (Id. at 28.) Qwest's Substance Abuse policy provided that:

> Qwest employees may not do any of the following while on Qwest premises during the work day (including overtime, meals, other break times and any Qwest related activities) ...
>
> - use controlled substances;
>
> - report to or be at work under the influence;
>
> - test positive for alcohol or controlled substances, regardless of when consumed or ingested ...
>
> Employees who violate these methods & procedures may be immediately discharged or subject to other discipline.

(Peterson Aff. Ex. 9 at 1-2.) In addition, the policy set forth Qwest's procedure for initiating drug and alcohol testing:

> An employee may be subject to alcohol or controlled substance testing ... [w]here Qwest has "reasonable suspicion" that an employee is using alcohol or controlled substances or is under the influence. "Reasonable suspicion" means Qwest has specific, contemporaneous, articulable observations concerning the employee's appearance, behavior, speech, or body odors and that the requirements, if any, mandated by applicable state or local laws are met.

(Id. at 3.) The policy noted that Qwest considered an employee's refusal "to take a test within required timeframes or when scheduled" as a "positive test." (McCoy Dep. Ex. 23 at 2.) From 2003 to 2006, McCoy electronically signed a yearly acknowledgment form stating that she had seen the Code of Conduct and agreed to comply with it. (Id. at 166, Exs. 25-27.)

In the mid-1990s, McCoy was diagnosed with migraines and bipolar affective disorder. Due to these conditions, Qwest certified McCoy for intermittent incapacity leave of four to five days per month under the Family Medical Leave Act ("FMLA") from December 2, 2004, to December 1, 2005. (Peterson Supplemental Aff. Ex. 21.) Qwest renewed McCoy's intermittent incapacity leave from June 22, 2005, to September 22, 2005. (Id. Ex. 22.) Qwest also informed McCoy in a June 22, 2005, letter that:

> [i]n order to have an absence protected under the FMLA policy, you will need to provide timely notification to both Qwest Disability Services and your supervisor.... When the leave is not foreseeable or it is not practicable to provide advance notice, such as intermittent incapacity, it is required that notice is provided within two business days following the date(s) of the absence. Failure to report absences in a timely manner may result in not having that absence protected under the FMLA policy even if a current certification is on record.

(Hasbrouck Aff. [Doc. No. 42-2] Ex. A at 1.) Lastly, Qwest granted McCoy contiguous FMLA leave from July 27, 2006, to August 3, 2006. (Peterson Supplemental Aff. Ex. 23.)

3

In spring and summer 2006, McCoy's work attendance fell below that required by the OEP policy. On May 19 and June 13 2006, Qwest issued McCoy written warnings for unsatisfactory performance due to absenteeism. (Id. Exs. 24-25.) On August 28, 2006,[1] Qwest issued McCoy a "Reiteration of Warning of Dismissal for Unsatisfactory Performance," stating that "[y]our twelve-month attendance record indicates you have fifteen occurrences...." (Id. Ex. 26.) As a result of that warning, McCoy was suspended for two days without pay. (Id.)

The parties dispute the events that led to McCoy's termination.[2] According to McCoy, on the morning of October 17,

---

[1] According to defendants, the "Reiteration of Warning of Dismissal" was issued on August 20, 2006. Defendant's reference to August 20, however, appears to be a typographical error. (McCoy Dep. Ex. 6; Peterson Supplemental Aff. Ex. 26.)

[2] According to Qwest, on the morning of October 17, McCoy logged on to her computer and telephone accounts nine minutes late. McCoy logged out an hour later, despite the fact that numerous customer calls remained unanswered. (McCoy Dep. Ex. 10.) Around 8:40 a.m., Linda Capetz ("Capetz"), McCoy's supervisor, noticed that McCoy was not at her desk and began to look for her. (Id.) At 9:35 a.m., Capetz saw McCoy return to her desk and remove her jacket, as if she had been outside. (Id.) Capetz asked McCoy if she was okay, and McCoy responded that she was fine and had just taken all of her daily allotted breaks. (Id.)
In the early afternoon, Capetz reviewed McCoy's daily phone report and saw that she had answered only one call. (Id.) At 1:45 p.m., McCoy again logged out of her computer and telephone accounts and was not present at her desk. (Id.)
Shortly after 3:00 p.m., McCoy came to Capetz's office and told Capetz that she had experienced a nosebleed. (Id.) Capetz noticed that McCoy had a cut above her eye and asked McCoy where she had been and whether she was hurt. (Id.) McCoy responded that she had been on break and that nothing had happened. (Id.) Capetz
(continued...)

4

2006, she was not feeling well due to a headache. (McCoy Dep. at 77.) Upon arriving at work, McCoy rested at her desk for forty-five minutes. (Id.) She then answered "whatever calls [she] could." (Id. at 78.) During the afternoon, McCoy continued to feel ill and went outside to try to relieve her headache. (Id.) McCoy later returned inside to use the restroom, where she experienced a nosebleed and remained until the bleeding subsided. (Id.)

Afterwards, McCoy went to Capetz's office and explained her absence. (Id.) Capetz, however, told McCoy that she did not believe her. (Id. at 78-79.) At that point, McCoy "fell apart and

---

²(...continued)
then reminded McCoy that she had already taken her daily allotted breaks and told her, "I don't think you are being honest with me." (Id.) At that point, McCoy "started crying uncontrollably." (Id.) Capetz contacted two other supervisors, Ozzie Larsen ("Larsen") and Brad Bodin ("Bodin"), and they completed a "Qwest Reasonable Suspicion Checklist," noting that McCoy displayed the following characteristics: "droopy eyelids, poor eye contact, glazed appearance, difficulty speaking, decreased inhibitions, extreme agitation or irritability, poor judgment, disorientation, unpredictable, impaired performance or attention, slow and deliberate responses, paranoia, mood changes, runny nose, fine body tremors in hands/fingers, flushed." (Doc. No. 24 at 19-20.) The supervisors agreed that McCoy should be tested for drugs and alcohol. (McCoy Dep. Ex. 10.)
While Capetz arranged for testing, Bodin and Larsen met with McCoy who "continued to cry and talk about the many problems she had. She appeared to shake and her conversation jumped around from one thing to another. Her eyes sometimes rolled back almost losing site [sic] of the pupils." (Id. Ex. 11.) When Capetz returned, she asked McCoy to undergo drug and alcohol testing. (Id. Ex. 10.) McCoy replied, "I can't do that." (Id. Exs. 10-11.) Capetz then told McCoy that a refusal to test would be considered an admission of drug use under Qwest's Substance Abuse policy. (Id. Ex. 10.) McCoy continued to refuse and left the premises. (Id. Exs. 10-11.)

5

just started sobbing and ... couldn't get under control." (Id. at 79.) Capetz summoned Larsen and Bodin to console McCoy. (Id.) McCoy "was crying [and] could hardly breathe" and began to tell Larsen and Bodin about "all of these problems going on in [her] life." (Id. at 80.) Capetz then asked McCoy to undergo drug and alcohol testing. (Id.) McCoy was taken aback by the request, and later testified that she "didn't even understand where that was coming from, and I told them I just couldn't handle it. I just simply couldn't handle it." (Id.) McCoy then returned to her desk. (Id. at 81.)

Later that evening, Qwest suspended McCoy pending an investigation of the day's events. (Id. Ex. 10.) On October 24, 2006, Qwest terminated McCoy and explained its decision in a dismissal memorandum:

> On October 17, 2006, it was determined by Linda Capetz and two other managers that your appearance and behavior demonstrated a reasonable suspicion to initiate a drug/alcohol test. When you were advised that you were being taken for the test, you refused to participate in the test. The management team again advised you that a test was necessary and that failure to have the test was self admission. You again refused. This refusal is a test positive under the Substance Abuse policy. As a result of the test positive, you have violated Qwest's Code of Conduct, specifically, Substance Abuse....
>
> On August 28, 2006, you were given a reiteration of warning of dismissal for unsatisfactory performance. The reiteration of warning of dismissal stated that failure to achieve and maintain satisfactory attendance,

6

>     failure to be present and working on work-
>     related items throughout your scheduled
>     workday, or failure to meet expectations in
>     any other area of performance, will result in
>     further disciplinary action, up to and
>     including dismissal. Your performance on
>     October 17, 2006, failed to meet expectations
>     when you violated the Code of Conduct
>     Substance Abuse policy. As a result, your
>     employment with Qwest is being terminated
>     effective October 24, 2006.

(<u>Id.</u> Ex. 19; Peterson Aff. Ex. 8.)

On April 2, 2008, McCoy filed a two-count complaint in state court against Qwest, alleging violations of the Family Medical Leave Act, 29 U.S.C. § 2615(a), and Minnesota's Drug and Alcohol Testing in the Workplace Act ("DATWA"), Minn. Stat. § 181.953, subdiv. 10. Qwest timely removed. The court now considers the parties' cross-motions for summary judgment.[3]

## DISCUSSION

**I. Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See <u>Celotex Corp. v. Catrett</u>,

---

[3] McCoy moved for partial summary judgment on the DATWA claim.

477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. Moreover, if a plaintiff cannot support each essential element of her claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Id. at 322-23.

**II. FMLA Claim**

Under the FMLA, an eligible employee is entitled to twelve work-weeks of leave during any twelve-month period if she has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA prohibits an employer "from interfering with, restraining, or denying an employee's exercise of or

8

attempted exercise of any [FMLA] right."[4] Stallings, 447 F.3d at 1050 (citing 29 U.S.C. § 2615(a)(1)).  To prevail on an interference claim, the plaintiff must show that she was entitled to FMLA leave and that the defendant unlawfully interfered with or denied that leave.  See id.  Interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  29 C.F.R. § 825.220(b).

McCoy contends that Qwest interfered with her FMLA rights by disciplining her on August 28, 2006, for taking FMLA leave in 2005 and 2006.[5]  While Qwest certified McCoy for intermittent leave from June 22, 2005, to September 22, 2005, McCoy was required to notify Qwest when her absences constituted protected FMLA leave.  See

---

[4] In addition to interference claims, the FMLA enables employees to assert retaliation claims in which "the employee alleges that an employer discriminated against [her] for exercising [her] FMLA rights."  Phillips v. Mathews, 547 F.3d 905, 909 (8th Cir. 2008) (citing Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 (8th Cir. 2006)); see 29 U.S.C. § 2615(a)(1),(2).  While McCoy only presents an interference claim, she nonetheless argues that the dismissal memorandum's reference to the August 28, 2006, warning indicates that Qwest terminated her due to absences allegedly protected by the FMLA.
   The dismissal memorandum, however, unambiguously states that McCoy was terminated due to her conduct on October 17, 2006, and refers to the August 28 warning for the limited purpose of noting that McCoy's refusal to test violated Qwest's performance expectations.  McCoy submits no other evidence indicating that Qwest terminated her in retaliation for taking FMLA leave.  Therefore, to the extent that McCoy asserts a retaliation claim, summary judgment is warranted.

[5] McCoy argues that the following absences constituted protected FMLA leave: July 17, 18, August 19, 20, 22, October 19, 20, November 12, 29, 30 and December 1, 2005; and July 27 to August 3, 2006.  (Pl.'s Mem. Opp'n ¶¶ 6-7.)

9

Phillips, 547 F.3d at 909 (employee must tell employer leave is needed within one or two business days of absence) (citing 29 C.F.R. § 825.302)). (See also Hasbrouck Aff. [Doc. No. 42-2] Ex. A at 1.) McCoy cites two documents as evidence of notification: a July 1, 2005, fax she sent to Qwest and a log entitled "McCoy time called in as FLMA [sic]." (Peterson Supplemental Aff. Exs. 17-18.)

After consideration of these documents, the court determines that no genuine issue of material fact exists as to whether the August 28, 2006, warning improperly included McCoy's 2005 and 2006 absences. While the fax details a doctor's June 29, 2005, opinion that McCoy required intermittent incapacity leave, it neither indicates specific dates that McCoy was absent from work nor requests Qwest to treat those absences as FMLA leave. (Id. Ex. 18.) The log references absences on November 29 and December 1, 2005, but does not indicate when McCoy asked Qwest to consider those absences as FMLA leave or to whom she directed the request. (Id. Ex. 17). With regards to the 2006 absences, it is undisputed that McCoy asked Qwest to consider those absences as FMLA leave, but Qwest declined approval on August 17, 2006, because McCoy had not submitted the necessary medical documentation. (Qwest Resp. Interrog. No. 12.) Once McCoy provided that information on September 27, 2006, Qwest "reverse approved" the 2006 absences as FMLA leave on September 29, 2006. (Id.) Lastly, McCoy testified that Qwest granted her timely requests for FMLA leave. (McCoy Dep.

at 230.) In light of this evidence, the court determines that McCoy cannot establish that Qwest interfered with or denied her FMLA rights. Accordingly, summary judgment is warranted on McCoy's FMLA claim.

**III. DATWA**

Pursuant to DATWA, "[a]n employer may not request or require an employee to undergo drug or alcohol testing unless the testing is done pursuant to a written drug and alcohol testing policy." Minn. Stat. § 181.951, subdiv. 1. That policy must set forth "the right of an employee to refuse to undergo drug and alcohol testing and the consequences of refusal." Id. § 181.952, subdiv. 1(3). DATWA further provides that, "[b]efore requesting an employee to undergo drug or alcohol testing, an employer shall provide the employee with a form, developed by the employer, on which to acknowledge that the employee has seen the employer's drug and alcohol testing policy." Id. § 181.953 subdiv. 6(a).

McCoy argues that Qwest violated DATWA by not providing her instructions about her right to refuse testing or an acknowledgment form immediately before asking her to undergo testing.[6] DATWA's plain language, however, does not require such a close temporal nexus. See id. §§ 181.952, subdiv. 1(3), 181.953 subdiv. 6(a).

---

[6] At oral argument on June 19, 2009, McCoy's counsel withdrew its argument that Qwest violated DATWA by not allowing McCoy to participate in a rehabilitation program prior to her termination.

11

Indeed, in circumstances where such a nexus was required, DATWA explicitly imposed a time requirement. See id. § 181.953, subdiv. 3 (requiring disclosure of test results "within three working days of confirmatory test"). Moreover, it makes little sense to provide a potentially impaired employee with a testing policy and acknowledgment form immediately before asking her to undergo drug and alcohol testing. Therefore, DATWA's use of "before" is not ambiguous and the court will not engage in statutory interpretation. See Hans Hagen Homes, Inc. v. City of Minnetrista, 728 N.W.2d 536, 539 (Minn. 2007) ("Where the legislature's intent is clearly discernable from plain and unambiguous language, statutory construction is neither necessary nor permitted.").

Lastly, McCoy received instructions about her right to refuse testing as well as an acknowledgment form before Qwest's October 17, 2006, request. From 2003 to 2006, McCoy signed four different acknowledgment forms stating that she had seen Qwest's Code of Conduct and related policies and agreed to comply. (McCoy Dep. at 166, Exs. 25-27.) Furthermore, Qwest's Substance Abuse policy sets forth an employee's refusal to test for drugs and alcohol and the consequences of such a refusal. (Id. Ex. 23 at 2.) Therefore, Qwest did not violate DATWA's requirements when it asked McCoy to undergo drug and alcohol testing and summary judgment is warranted on McCoy's DATWA claim.

12

## CONCLUSION

Based upon the file, record and proceedings herein, and for the reasons stated, **IT IS HEREBY ORDERED** that:

1. Plaintiff's partial motion for summary judgment [Doc. No. 29] is denied.

2. Defendant's motion for summary judgment [Doc. No. 14] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September 24, 2009

                                          s/David S. Doty  
                                          David S. Doty, Judge  
                                          United States District Court